UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES EQUAL
EMPLOYMENT OPPORTUNITIES
COMMISSION, ET AL.,

       Plaintiffs,

v.                                          Case No. 8:04-cv-2155-T-24 TBM

ROOMS TO GO, INC., ET AL.,

       Defendants.
_____/

## ORDER

This cause comes before the Court on Defendants' Motion for Summary Judgment. (Doc. No. 45). Plaintiffs oppose the motion. (Doc. No. 72).

**I.  Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. Id. at 325.

When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories,

and admissions on file," designate specific facts showing there is a genuine issue for trial. Id. at 324. In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

## II. Background

Plaintiffs (the EEOC, Tammy Leigh, and Tanya Morrison) filed suit against Defendants (Rooms to Go, Inc. and R.T.G. Furniture Corp.) for creating a sexually and racially hostile work environment. Morrison worked for R.T.G. Furniture Corp. ("RTG") as a sales associate at the Seffner Clearance Center from July of 1995 through August of 2002.[1] Leigh, an African-American woman, worked for RTG as a sales associate at the Seffner Clearance Center from May of 1998 through January of 2004. Throughout the time period relevant to this action, Morrison and Leigh reported directly to Thomas Smaldone, the Seffner Clearance Center Manager.

Leigh contends that she was subjected to racial harassment at the Seffner Clearance Center by Smaldone, Regional Manager Ed Biard, and co-worker Phil Rogers. Specifically, Leigh contends that Smaldone referred to African-American customers as "your people," "your kind," and "your boys." (Leigh depo, p. 86). Additionally, Smaldone would say that African-Americans "couldn't have any money unless they were drug dealers or doing something illegal."

---

[1] Due to her pregnancy, Morrison requested a transfer to the customer service department in RTG's corporate office in August of 2002. (Morrison depo, p. 45-46). Morrison resigned from her employment with RTG in the Spring of 2003. (Morrison depo, p. 46).

(Leigh depo, p. 86, 102).  Smaldone told Leigh that Biard had commented on Leigh's trip to Jamaica by saying that she went there to "do drugs, run around naked and F everybody."  (Leigh depo, p. 107).

Smaldone referred to African-American male employees as "Kunta Kinte" and "Sambo." (Leigh depo, p. 107, 254, 309-10).  Smaldone would refer to Leigh as a "black bitch" and "his token black." (Leigh depo, p. 110, 117, 283).  Leigh was told by a co-worker that Smaldone referred to her as "his little nigger girl" when he was at a manager's meeting in Miami.  (Leigh depo, p. 258-60).  Leigh heard Smaldone refer to a broken table as "nig-rigged," cutting himself off before saying the entire word, "nigger."  (Leigh depo, p. 254, 269).

Smaldone hated interracial couples and referred to them as Oreos, Milanos, and zebras.[2] (Leigh depo, p. 102, 117).   However, Smaldone repeatedly told Leigh about his sexual experience with an African-American woman.  (Leigh depo, p.105-06).

Leigh contends that her co-worker, Rogers, did not like African-American people, and he had an intense hatred for her because she is African-American.  (Leigh depo, p. 70-71, 115). Leigh contends that Rogers made racially offensive comments, but she did not hear all of the comments first-hand.  (Leigh depo, p. 69).  Rogers used the word "nigger" multiple times at the Seffner Clearance Center during the course of his employment.  (Rogers depo, p. 74-75). Specifically, three or four times a year, someone would bring in jokes that would contain the word "nigger," and Rogers and a majority of the salespeople would pass around the written jokes and recite the jokes verbally.  (Rogers depo, p. 75-76).  With equal frequency, Rogers and a majority of the salespeople would pass around and recite jokes of a sexual nature.  (Rogers depo,

---

[2]Leigh is married to a white man.  (Leigh depo, p. 294).

3

p. 81).

Morrison also contends that Rogers made sexually offensive and racially offensive comments. (Morrison depo, p. 31, 59). Likewise, Morrison contends that Smaldone made sexually offensive and racially offensive comments on a continuous, almost daily basis and that Smaldone encouraged Rogers' behavior by acting the same way. (Morrison depo, p. 31, 60, 66, 136, 155). Additionally, Morrison contends that Smaldone made references to her breasts, asked to see her breasts or asked for a blow job when she asked for price approval, and touched her breasts and buttocks on several occasions. (Morrison depo, p. 49, 60, 119, 136). Smaldone also referred to Morrison as a hooker, prostitute, sales whore, and bitch. (Morrison depo, p. 135).

There was an anti-harassment policy in place during Morrison and Leigh's employment, and the 1996 version of the policy stated that complaints of harassment should be reported to the Human Resources department and that such complaints would only be accepted in writing. (Gerow affidavit, ¶12 & Ex. 1). The 1996 version of the anti-harassment policy remained in place until it was revised in 2002. (Gerow affidavit, ¶12). The 2002 version of the anti-harassment policy provides that any person experiencing or witnessing harassment "is urged to submit an internal complaint in writing pursuant to the Internal Complaint Procedure" to the Human Resources department. (Gerow affidavit, ¶12 & Ex. 2).

In January of 2001, Leigh and Morrison went together to see Linda Garcia, the Director of Human Resources. (Leigh depo, p. 65; Morrison depo, p. 59; Garcia depo, p. 18, 20). During this meeting, Morrison told Garcia that Rogers was racially offensive, that he used the word "nigger," that he referred to African-Americans as "those people," and that he was offensive and vulgar towards women. (Morrison depo, p. 59; Garcia depo, p. 49, 50). Morrison told Garcia

that Smaldone encouraged Rogers' behavior, because Smaldone was racially and sexually offensive on a daily basis. (Morrison depo, p. 60). Morrison also reported that Smaldone made references to her breasts, asked to see her breasts or asked for a blow job when she asked for price approval, and touched her breasts and buttocks on several occasions. (Morrison depo, p. 60).

Leigh told Garcia that Smaldone exhibited sexually and racially offensive behavior towards her and that Smaldone referred to them as black bitch and white bitch. (Morrison depo, p. 66). Leigh told Garcia that Rogers did not like African-American people, and as a result, he had an intense hatred towards her. (Leigh depo, p. 70-71). Leigh also told Garcia that she did not hear first-hand all of the racially offensive comments that were made by Rogers. (Leigh depo, p. 69). Leigh told Garcia that Smaldone allowed the offensive racial comments and that he participated in making the comments. (Leigh depo, p. 71). Leigh told Garcia that Smaldone referred to women as hookers, whores, and prostitutes. (Leigh depo, p. 71).

Garcia told Leigh and Morrison that their complaints would be taken care of. (Leigh depo, p. 124). Garcia gave Morrison and Leigh an Internal Complaint Form to fill out. (Leigh depo, p. 74; Morrison depo, p. 68). However, neither Leigh nor Morrison filled out and submitted the form. (Leigh depo, p. 76; Morrison depo, p. 76). Garcia never told them that it was mandatory that they fill out the form regarding the alleged harassment. (Morrison depo, p. 74; Garcia depo, p. 66). Garcia gave Morrison the impression that Morrison and Leigh's verbal complaints of harassment were sufficient to warrant an investigation into the allegations. (Morrison depo, p. 76). Garcia told Leigh that completing the written complaint form was optional and that she would look into their allegations and would handle it. (Leigh depo, p. 75,

81; Garcia depo, p. 67). However, Garcia did not interview Rogers or Smaldone regarding Leigh and Morrison's complaints. (Garcia depo, p. 62-63).

In November of 2001, Morrison verbally reported Smaldone's sexual harassment to Janet Gerow, the Human Resources Manager whose primary responsibilities included administering the anti-harassment policy for the Seffner Clearance Center. (Morrison depo, p. 98-100; Gerow depo, p. 18, 96). Specifically, Morrison told Gerow that Smaldone had been harassing her for a long time by doing such things as asking for blow jobs and asking to see her breasts. (Morrison depo, p. 99-100). Gerow did not investigate Morrison's complaints. (Gerow depo, p. 46).

In early 2002, Leigh verbally reported Smaldone's sexual and racial harassment to Gerow. (Leigh depo, p. 102-03). Specifically, Leigh told Gerow that Smaldone would ask for a blow job and to see her breasts when responding to a request for price approval. (Leigh depo, p. 102). Leigh also told Gerow that Smaldone would say that African-American people couldn't have any money unless they were drug dealers or doing something illegal. (Leigh depo, p. 102). Additionally, Leigh told Gerow that Smaldone hated interracial couples and would refer to them as Oreos, Milanos, and zebras. (Leigh depo, p. 102). Gerow responded that she was going to handle the problem. Leigh depo, p. 102). However, Gerow did not investigate Leigh's complaints. (Gerow depo, p. 46).

Leigh made a second verbal report of sexual and racial harassment to Garcia at least six months before filing a charge of discrimination with the EEOC in June of 2002. (Leigh depo, p. 103-05). During this meeting with Garcia, Leigh told her that the harassment was still present. (Leigh depo, p. 105). Leigh also told Garcia that Smaldone continued to call her a bitch, hooker, and prostitute and that he always referred to her color. (Leigh depo, p. 105). Leigh also told

Garcia that Smaldone would ask for a blow job or to see her breasts when she would ask for price approval. (Leigh depo, p. 106). Leigh also told Garcia that Smaldone was always making racial statements, such as calling a male employee Kunta Kinte. (Leigh depo, p. 107). Additionally, Leigh told Garcia that Smaldone referred to Leigh as "his token black." (Leigh depo, p. 110). Leigh also told Garcia that Smaldone told Leigh that Biard had commented on Leigh's trip to Jamaica by saying that she went there to "do drugs, run around naked and F everybody." (Leigh depo, p. 107).

Leigh and Morrison's complaints of sexual and racial harassment were not investigated until after Leigh and Morrison filed charges with the EEOC in June of 2002. (Gerow depo, p. 45-46). The only action taken prior to Leigh and Morrison filing charges with the EEOC was Biard addressing the sales force sometime in 2002[3] on the policies on proper behavior among the sales force, such as no bickering, no fighting over customers, no using nicknames, no using profanity, no making racial, sexual, or ethnic comments, no name calling, and that they were to conduct themselves in a professional manner at all times. (Biard depo, p. 78, 87; Leigh depo, p. 82-83). Biard stated that anyone who violated these behavior rules would be subject to disciplinary action. (Leigh depo, p. 83). Garcia asked Biard to conduct this meeting with the sales force, but Biard did not know that complaints of sexual and racial harassment had been made when he addressed the sales force, and he did not know what prompted Garcia to ask him to address the sales force on proper behavior. (Biard depo, p. 78, 122-23).

On September 28, 2004, Plaintiffs filed suit against Defendants. The EEOC asserts a

---

[3]The Court presumes that the meeting occurred sometime in 2002 because Leigh states in her deposition that it occurred after she spoke with Garcia, but it did not occur in 2001. (Leigh depo, p. 82).

claim against Defendants under Title VII for the creation of a racially and sexually hostile work environment. Leigh alleges a racially hostile work environment in violation of Title VII, and Leigh and Morrison allege a sexually hostile work environment in violation of Title VII and the Florida Civil Rights Act ("FCRA").

### III. Defendants' Motion for Summary Judgment

Defendants move for summary judgment, arguing: (1) the alleged racial comments were not sufficiently severe or pervasive to support a racially hostile work environment claim; (2) RTG has established an affirmative defense to the claims; (3) Rooms to Go, Inc. is not an employer, and as such, cannot be held liable; and (4) the claims made on behalf of similarly situated individuals should be dismissed. Accordingly, the Court will address each argument.

#### A. Severe or Pervasive

Defendants move for summary judgment on Plaintiffs' hostile work environment claim based on race. In order to establish a prima facie case of a racially hostile work environment, Plaintiffs must show that (1) Leigh belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on the protected characteristic, her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and thus create a discriminatorily abusive work environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious liability. Laosebikan v. Coca-Cola Co., 2006 WL 224167, at *5 (11th Cir. Jan 31, 2006)(citation omitted). Defendants argue that Plaintiffs cannot show that the fourth element is met–that the harassment was sufficiently severe or pervasive.

The "severe or pervasive" element has both a subjective and objective component: "[t]he

employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999)(citation omitted). While in the instant case, Leigh subjectively perceived the alleged racial harassment to be sufficiently severe and pervasive, the Court must determine whether her perception was objectively reasonable.

With regards to the objective component, courts consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. (citations omitted). "[C]ourts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." Id. (citations omitted).

"Generally speaking, 'isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" Walton v. Johnson & Johnson Svcs., Inc., 347 F.3d 1272, 1285 n.12 (11th Cir. 2003)(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Furthermore, Title VII is not a "'general civility code.'" Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000)(quoting Faragher, 524 U.S. at 788). However, the Court notes that there is no magic number of racially offensive comments that must be made in order for the harassment to create a hostile work environment. See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002)(citation omitted).

9

Construing the facts in the light most favorable to Plaintiffs and given that Plaintiffs contend that the offensive racial comments were made on a daily basis, the Court finds that a genuine issue of material fact exists as to whether the harassment was severe or pervasive. The Court rejects Defendants' arguments to the contrary.

For instance, Defendants argue that Leigh cannot show that the alleged harassment was severe or pervasive because she produced a calendar covering the months of May, June, and July of 2002 that only contained one[4] notation concerning racial harassment.[5] The Court rejects this argument, given that Leigh filed a charge of discrimination in June of 2002, so the lack of incidents of racial harassment after the filing of the charge of discrimination does not establish that such incidents did not occur prior to the filing of the charge. Furthermore, when asked during her deposition whether there were any other notations indicating racial harassment, Leigh responded that while there was nothing else listed on the calendar for those three months, she was not saying that no other harassment occurred during that time. (Leigh depo, p. 241). She also stated that she did not keep a record of all of the harassment that occurred on the calendar. (Leigh depo, p. 240).

Defendants also argue that Leigh cannot show that the alleged harassment was severe or pervasive because the harassment did not impair Leigh's job performance. Specifically,

---

[4]There was a second notation concerning an incident when Rogers got in Leigh's face and was screaming at her. (Leigh depo, p. 242). It is unclear whether this incident was based on Leigh's race.

[5]Leigh's calendar contains a notation on May 10, 2002. (Doc. No. 54, Ex. 14 to Leigh's deposition). Leigh stated that on that day, Smaldone commented that an African-American man's additional income on his credit application must have come from drugs. (Leigh depo, p. 241-42).

Defendants point out that Leigh concedes that her sales performance was "excellent" for most of her employment and that in late February 2002, she was recognized for being the most successful salesperson in four out of five sales categories. (Leigh depo, p. 46, 47). The Court rejects this argument. While the effect of the harassment on the employee's job performance is a factor to be considered, a "plaintiff need not show that the harassment was so extreme that it produced tangible effects on [her] job performance in order to be actionable." Mosley v. Meristar Mgmt Co., LLC, 137 Fed. Appx. 248, 252 (11th Cir. 2005)(citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)); Miller, 277 F.3d at 1277 (citation omitted). The Supreme Court has stated that discriminatory conduct that is so severe or pervasive that it creates a work environment that is abusive to an employee because of her race, but which does not result in tangible effects on the employee's job performance, violates Title VII. See Harris, 510 U.S. at 22.

Defendants also argue that the alleged harassment was not severe or pervasive, since Leigh was not even present when some of the alleged racial comments were made. The Court rejects this argument. As explained by one court:

> The pervasiveness of conduct constituting [racial] harassment outside [the plaintiff's] presence works to rebut the assertion that the conduct of which [the plaintiff] complains is isolated or rare. Second, the issue in [a hostile work environment] case is the nature of the work environment. This environment is shaped by more than the face-to-face encounters between [the plaintiff] and . . . coworkers and supervisors. The perception that the work environment is hostile can be influenced by the treatment of other persons of a plaintiff's protected class, even if that treatment is learned second-hand.

Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1499 (M.D. Fla. 1991); see also Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995)(citation omitted); Busby v. City of Orlando, 931 F.2d 764, 785 (11th Cir. 1991)(citing Walker v. Ford Motor Co.,

684 F.2d 1355, 1359 n.2 (11th Cir. 1982)).

Defendants also argue that the following conduct undermines Leigh's allegation of racial harassment: (1) she asked that Smaldone be present when she worked with Rogers; (2) she declined a transfer away from the Seffner Clearance Center; (3) in March of 2002, she had a housewarming party and invited Smaldone, and (4) Leigh's husband met Smaldone at least fifteen times, and he did not address the alleged harassment with Smaldone. The Court rejects these arguments.

With respect to Defendants' contention that Leigh asked that Smaldone be present when she worked with Rogers, Leigh stated in her deposition that she asked that Smaldone *or some member of management* be present when she worked with Rogers. (Leigh depo, p. 66). With respect to Defendants' contention that Leigh declined a transfer away from the Seffner Clearance Center, the offers to transfer came in 2004 and Leigh ended her employment shortly thereafter. (Leigh depo, p. 39-44). Additionally, Leigh stated in her deposition that she had asked to be transferred from the Seffner Clearance Center, but she declined a transfer to the Clearwater store and to a position in telemarketing. (Leigh depo, p. 39-44).

With respect to Defendants' contention that inviting Smaldone to a housewarming party in March of 2002 undermines her harassment claim, the Court rejects this argument as Leigh invited the entire staff of the Seffner Clearance Center to her party. (Leigh depo, p. 63-64). Additionally, the Court rejects Defendants' argument that Leigh's husband's failure to confront Smaldone about the harassment undermines Leigh's harassment claim.

Accordingly, the Court finds that a genuine issue of material fact exists as to whether Leigh was subjected to a racially hostile work environment. As such, the Court denies summary

judgment on this issue.

## B. Affirmative Defense

RTG argues that it is entitled to summary judgment on Plaintiffs' hostile work environment claims based on race and sex that arise from Smaldone and Biard's conduct, because it can establish the two-part affirmative defense.[6] The affirmative "defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. Accordingly, the Court will analyze each element.

### 1. Prevent and Promptly Correct Harassing Behavior

The first element of the affirmative defense is that the employer exercised reasonable care to prevent and promptly correct the harassing behavior. RTG contends that it satisfies this element, because there was an adequate anti-harassment policy in place. While proof that an employer had promulgated an anti-harassment policy with a complaint procedure is relevant when analyzing this element, having such an anti-harassment policy is not sufficient in itself to satisfy this element in the instant case. See Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1314 (11th Cir. 2001). This is because RTG must also show that it acted in a reasonably prompt manner in responding to Morrison and Leigh's complaints. See id.

---

[6] "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807. However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages." Id.

13

RTG argues that it acted promptly to correct the harassing behavior by having Biard address the sales force on proper behavior. The Court, however, finds that a genuine issue of material fact exists regarding whether this was sufficient given that: (1) Biard did not address the sales force until 2002[7], and (2) despite Leigh and Morrison's four complaints of discrimination to the manager and director of Human Resources[8], RTG did not investigate Morrison and Leigh's complaints until it received the charges of discrimination in June of 2002 from the EEOC.[9]  See Walton, 347 F.3d at 1288 (noting that the employer's inadequate investigation into a complaint is relevant if the substantive measures taken by the employer are not sufficient to address the harassing behavior). Therefore, there is a genuine issue of material fact regarding the first element of the affirmative defense, which precludes summary judgment.

### 2.  Employee's Unreasonable Failure to Take Advantage of Corrective Opportunities

The second element of the affirmative defense is that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  RTG contends that Leigh and Morrison unreasonably failed to take

---

[7]Additionally, since Defendants do not point to evidence indicating when in 2002 Biard addressed the sales force, the Court cannot determine whether Biard's actions ended the allegedly harassing behavior.

[8]These complaints occurred: (1) in January of 2001; (2) November of 2001; (3) early 2002; and (4) at least six months before filing charges of discrimination with the EEOC.

[9]The Court notes that "the question of whether an employer timely acted to correct harassment turns on when it had proper notice of an employee's harassment complaint." Frederick, 246 F.3d at 1315. RTG argues that proper notice was not given, since Leigh and Morrison failed to submit their complaints in writing. However, as explained in section III-B-2, the Court finds that there is a genuine issue of material fact regarding whether Leigh and Morrison gave Defendants proper notice of their harassment complaints given Leigh and Morrison's contention that Garcia and Gerow led Leigh and Morrison to believe that their verbal complaints were sufficient.

advantage of the complaint procedure set forth in the anti-harassment policy, since they failed to submit their harassment complaints in writing.  The Court, however, finds that a genuine issue of material fact exists as to whether Leigh and Morrison's actions were reasonable given their contention that Garcia and Gerow led them to believe that their verbal complaints were sufficient.  See Frederick, 246 F.3d at 1314 (stating that in some cases the evidence will show that an employee's failure to follow the complaint procedures was reasonable under the circumstances).  Furthermore, the cases cited by RTG in support of its contention that Leigh and Morrison unreasonably failed to take advantage of the complaint procedure set forth in the anti-harassment policy are distinguishable, because those cases focus on whether the appropriate person received the complaint of harassment, not whether the complaint of harassment was submitted to the appropriate person but in the wrong format (i.e., verbally as opposed to being in writing).  See Frederick, 246 F.3d at 1316 (finding a genuine issue of material fact regarding whether the plaintiff complained of harassment to the appropriate person under the employer's anti-harassment policy); Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1300 (11th Cir. 2000)(stating that the employer did not have notice of the harassing behavior because the plaintiff's complaint of harassment was not given to an individual designated by the employer to receive or process harassment complaints); Masson v. School Board of Dade County, Fla., 36 F. Supp.2d 1354, 1359 (S.D. Fla. 1999)(noting that the plaintiff did not file a complaint with the appropriate person under the employer's anti-harassment policy).  Therefore, there is a genuine issue of material fact regarding the second element of the affirmative defense, which precludes summary judgment.

### C.  Employer Status

Rooms To Go, Inc. contends that it is not an employer with respect to Leigh and Morrison, and as such, it is entitled to summary judgment on Plaintiffs' claims.[10] While Leigh and Morrison were employed by R.T.G. Furniture Corp., Plaintiffs argue that Rooms To Go, Inc. was a joint employer under Title VII.

One court has described the joint employer theory as follows:

> The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

Virgo v. Riviera Beach Associates, Ltd., 30 F.3d 1350, 1360 (11th Cir. 1994)(quoting NLRB v. Browning-Ferris Industries, 691 F.2d 1117, 1122 (3d Cir. 1982)).  The focus of the inquiry is "the degree of control an entity has over the adverse employment decision on which the Title VII suit is based."  Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1244-45 (11th Cir. 1998); see also Lyes v. City of Riviera Beach, Florida, 166 F.3d 1332, 1345 (11th Cir. 1999)(stating that the focus of the inquiry is "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim").  Whether an entity has retained sufficient control to be deemed a joint employer is a question of fact.  See id. (citations omitted).

Plaintiffs contend that Rooms To Go, Inc. is a joint employer because Gerow, the Manager of Human Resources whose responsibilities included administering the anti-harassment

---

[10] Rooms To Go, Inc. owns the trademark "Rooms To Go." Rooms To Go, Inc. licenses the trademark to companies operating Rooms To Go stores. (Gerow affidavit, ¶ 5).

policy for the Seffner Clearance Center, was employed by Rooms To Go, Inc.[11] (Gerow depo, p. 95-103; Gerow affidavit, ¶ 2). Additionally, the anti-harassment policies in place from 1996 through 2002, as well as the employee ethics hotline flyer distributed to R.T.G. Furniture Corp. employees refer to "Rooms To Go" or "RTG," not R.T.G. Furniture Corp. (Gerow affidavit, Ex. 1, 2, 4).

Defendants, in moving for summary judgment, have not addressed the effect, if any, of Rooms To Go, Inc.'s alleged control over the administration of the anti-harassment policy for the Seffner Clearance Store on the joint employer analysis. Since Defendants have not addressed this issue[12], the Court denies summary judgment without deciding whether Rooms To Go, Inc.'s alleged involvement is sufficient to confer joint employer status.

### D. Similarly Situated Individuals

The EEOC filed its complaint under Title VII to correct unlawful employment practices on the basis of race and sex and to provide appropriate relief to Leigh, Morrison, and any other similarly situated individuals that were adversely affected by such practices. The EEOC states in

---

[11]It is unclear whether Gerow works for Rooms to Go, Inc. or R.T.G. Furniture Corp., since she states in her affidavit that she works for "Rooms To Go," yet she refers to Defendants in the affidavit as "Artemis Marketing Corp. f/k/a Rooms To Go, Inc." and "R.T.G. Furniture Corp." As such, it is unclear which entity Gerow actually works for. However, since this is a motion for summary judgment and the Court must construe the facts in the light most favorable to Plaintiffs, the Court construes Gerow's statement as meaning that she works for Rooms To Go, Inc.

[12]Defendants have alleged that Rooms To Go, Inc. does not participate in, oversee, or review any sexual or racial harassment investigations, including the investigation of Leigh and Morrison's claims. (Gerow affidavit, ¶ 11). However, there is a question of fact as to whether this statement is accurate (given Gerow's vague statement regarding which entity that she works for), and as such, the Court must assume for the purposes of the motion that Rooms To Go, Inc. did participate in the investigation. Assuming that Rooms To Go, Inc. did so participate, Defendants must address how such participation affects the joint employer analysis.

its response to the motion for summary judgment that with respect to the other similarly situated individuals, it is only seeking injunctive relief in the form of enjoining Defendants from engaging in sexual and racial harassment and any other practices that discriminate on the basis of race or sex.

Defendants move to dismiss the EEOC's claims on behalf of similarly situated individuals, because the EEOC has failed to identify any similarly situated individuals despite being requested to do so in interrogatories. (Doc. No. 64, p. 12). Defendants, however, have failed to cite any case law to support their argument that dismissal of the EEOC's claims on behalf of similarly situated individuals is warranted. As such, the Court denies Defendants' motion on this issue.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (Doc. No. 45) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 8th day of March, 2006.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record